No.05-557

IN THE SUPREME COURT OF THE STATE OF MONTANA

2006 MT 239

DAVID W. GWYNN, d/b/a
GWYNN EXCAVATING,

       Plaintiff and Appellant,

   v.

DOUGLAS CUMMINS and
KIM CUMMINS,

       Defendants and Respondents.

APPEAL FROM:     The District Court of the Fourth Judicial District,
                 In and For the County of Missoula, Cause DV 05-067,
                 Honorable John W. Larson, Presiding Judge

COUNSEL OF RECORD:

       For Appellant:

              Lars R. Skjelset, Skjelset & Geer, P.L.L.P., Missoula, Montana

       For Respondents:

              Cory R. Gangle, Milodragovich, Dale, Steinbrenner & Binney, P.C.
              Missoula, Montana

Submitted on Briefs:  June 7, 2006

Decided:   September 26, 2006

Filed:

_____
                     Clerk

Justice Jim Rice delivered the Opinion of the Court.

¶1    David Gwynn (Gwynn) appeals from a summary judgment order entered for Douglas and Kim Cummins (the Cumminses) by the Fourth Judicial District Court, Missoula County.  We reverse and remand.

¶2    We consider the following issue on appeal:

¶3    Whether the District Court properly granted summary judgment for the Cumminses.

## BACKGROUND

¶4    In May 2004, the Cumminses obtained a bid proposal from Philip "Po" Hemry (Hemry), of Hemry Construction, to prepare their land and construct a concrete foundation for placement of their new modular home. The total bid for the construction project was $9,200, including the excavation work, which Hemry itemized in the bid at $2,000.  In June 2004, Hemry hired Gwynn as a subcontractor to perform the excavation work on the Cumminses' property. Hemry told Gwynn that the contract work would be limited to excavation for a foundation with three-foot walls and backfill once the foundation was laid. The only portion of the proposal referencing the subcontract provided: "[d]ig out and bacfill [sic] with machine grade ($2000.00)."

¶5    What thereafter occurred between the parties is disputed, and, on review of the entry of summary judgment, we look to the parties' factual assertions, which are set forth as follows.  Gwynn alleges that he and his assistant, Wayne Nelson (Nelson), agreed to dig a hole for the foundation of the Cumminses' home, and after Hemry installed the

2

foundation, to backfill the hole and machine grade the surface around the foundation. However, when they arrived at the site on July 3, 2004, Gwynn and Nelson discovered that there was a 14' x 70' x 4" concrete pad on the site that had to be removed, and, further, the Cumminses advised them that the foundation walls would need to be four feet high instead of three feet. Gwynn informed the Cumminses that the $2,000 bid did not include the removal of the concrete pad and extra one foot of excavation. The Cumminses agreed to pay an additional $400 for removal of the concrete pad and for burial of the demolished portions on the work site. Gwynn informed them of the additional cost for excavating and backfilling the four-foot foundation wall (an additional eighty-eight cubic yards of fill), and the Cumminses told him to proceed. Gwynn demolished the concrete pad and laid the broken concrete at a place the Cumminses specified, to be covered later by over dig materials.

¶6      The Cumminses requested that Gwynn and Nelson use excavated backfill to construct a roadway to the lower portion of their property. Gwynn notified the Cumminses that he would charge an additional amount for hauling the fill and spreading it out. At the Cumminses' direction, Gwynn and Nelson laid out the roadway, using approximately twenty-four cubic yards of fill material, and taking an additional four and half hours of time.

¶7      On July 5, 2004, Gwynn finished excavating the pit for the four-foot foundation. Gwynn claims that the Cumminses then changed their mind about burying the demolished concrete pad on site, and asked Gwynn to haul the concrete pieces away

rather than bury them. Gwynn apprised the Cumminses of the additional fees for loading, hauling, and dumping these materials off site, and the Cumminses assured Gwynn that they would pay him for the additional work. On July 24, 2004, they asked Gwynn to remove a mound of earth located fifteen feet away from the foundation, which Gwynn did. The Cumminses then requested Gwynn to compact the clay dirt surrounding the excavated foundation pit, which took him several more hours to complete. The Cumminses then asked Gwynn to dig a 10' x 2' x 2' ditch to connect the foundation with the site of the septic tank, and, following Gwynn's completion of the trench, asked him to dig up and fix a leaking septic line that connected the septic tank to its drain field, which Gwynn also completed.

¶8     On July 25, 2004, his fourth day on site, Gwynn began backfilling the four-foot foundation hole, and finished it the next day. On July 26, 2004, Gwynn, his wife Diana Gwynn (Diana), and Nelson hauled out three loads of the demolished concrete pad. After Diana and Nelson left the site, Gwynn claims the Cumminses approached him and informed him that he would only be paid $180 for the extra work they had ordered. Gwynn replied that that was not what they had agreed to, and alleges that Doug Cummins retorted, "[t]o hell with you, I ain't paying you nothing," then turned around, ran, and drove away. After Gwynn related the conversation to Diana and Nelson, the three stopped working, took some photographs of the site, and proceeded to pack up their equipment. Hemry finished the excavation work.

4

¶9 On July 29, 2004, Hemry billed the Cumminses for $9,200, corresponding to Hemry's original bid. The Cumminses paid the bill, and Hemry issued them a "Receipt and Waiver of Construction Lien" on August 12, 2004, indicating that he had received payment and that the contract was paid in full. The invoice Hemry produced evidenced a contract between Hemry and the Cumminses, along with Gwynn's status as a subcontractor. After the Cumminses paid Hemry, he attempted to pay Gwynn $2,000 for his subcontract work. Gwynn refused this payment, and Hemry sent the Cumminses the returned $2,000. The Cumminses then tried to pay this amount to Gwynn themselves, but Diana refused payment, as acceptance would involve signing a lien release, and informed the Cumminses that the bid was not for $2,000. Hemry alleges that Gwynn did not actually finish the work he claims to have performed, and in fact all the work was part of the original excavation bid of $2,000.

¶10 On August 23, 2004, Gwynn filed a construction lien on the Cumminses' residence to secure payment for his services. Gwynn filed the lien without sending prior notice to the Cumminses. On January 21, 2005, Gwynn filed an action in the District Court to foreclose upon the lien. Gwynn served the Cumminses with the complaint on February 4, 2005. Gwynn contended that the proposal and invoice did not make any provision for the extra services he provided, including road building, septic trench digging and repair, demolition, and hauling materials off-site. Gwynn provided an itemized bill for his services, and claimed that the Cumminses owed him a total of $4,305. The Cumminses claimed that the additional work they requested was but a part

5

of the "plethora of other services that were supposed to be part of the original excavation contract." On February 17, 2005, the Cumminses filed an offer of judgment for $2,000. On February 25, 2005, the Cumminses moved to dismiss the complaint on the grounds that (1) Gwynn was required to file notice of a right to claim a lien because he was performing services as a subcontractor to Hemry; and (2) Gwynn had not completed his work, and therefore, he was not entitled to claim a lien. On March 8, 2005, the Cumminses filed a second offer of judgment for $2,500. The parties waived oral arguments. On April 27, 2005, the District Court granted summary judgment in favor of the Cumminses, concluding that the construction lien was invalid because there were no genuine issues of material fact that Gwynn (1) had not substantially completed the work, and (2) that the subcontract covered all the services Gwynn provided, and thus an exception to the notice requirement did not apply. Gwynn subsequently filed a Rule 56(g) Motion to Alter or Amend, which the District Court denied on July 13, 2005. This appeal follows the grant of summary judgment from the District Court's opinion and order from April 27, 2005.

## STANDARD OF REVIEW

¶11   The standard of review for a district court's grant of summary judgment is *de novo*. *Casiano v. Greenway Enterprises, Inc.*, 2002 MT 93, ¶ 13, 309 Mont. 358, ¶ 13, 47 P.3d 432, ¶ 13. Upon appeal or review of a district court's grant of summary judgment, this Court applies the same evaluation as the district court. *Bruner v. Yellowstone County*, 272 Mont. 261, 264, 900 P.2d 901, 903 (1995). This Court has

consistently held that the party moving for summary judgment must demonstrate that there are no genuine issues of material fact. *Bruner*, 272 Mont. at 264, 900 P.2d at 903. Once this is accomplished, the burden then shifts to the non-moving party to prove, by more than mere denial and speculation, that a genuine issue of fact does exist. *Bruner*, 272 Mont. at 264, 900 P.2d at 903.

¶12 Rule 56 of the Montana Rules of Civil Procedure governs summary judgment motions. M. R. Civ. P. 56(c) provides in pertinent part:

> [Summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The primary policy and general purpose underlying summary judgment is to encourage judicial economy through the prompt elimination of questions not deserving resolution by trial. *Olson v. Osmolak*, 2003 MT 151, ¶ 13, 316 Mont. 216, ¶ 13, 70 P.3d 1242, ¶ 13. However, summary judgment is never to be a substitute for trial if a material factual controversy exists. *Reaves v. Reinbold*, 189 Mont. 284, 288, 615 P.2d 896, 898 (1980).

## DISCUSSION

¶13 Gwynn contends that the District Court erred in determining that no genuine issues of material fact exist regarding whether he was required to give notice prior to filing his lien. Gwynn argues that he furnished services and materials directly at the Cumminses' personal request and undertook and "completed" several projects which the subcontract did not cover, and thus an exception to the notice requirement applies.

7

¶14     In response, the Cumminses argue that the District Court properly concluded that the written contract incorporated all aspects of the work performed by Gwynn, and thus notice of his right to claim a lien was required.  Secondly, the Cumminses argue that there is no genuine issue of material fact that Gwynn's lien failed because he did not complete the project. Further, they argue that Gwynn did not preserve this issue for appeal because he did not appeal the District Court's determination that he did not substantially complete the project.  However, we conclude that the issue of substantial completion was sufficiently incorporated within what Gwynn describes as his "umbrella" argument, wherein he asserts that he "completed" projects in addition to the original subcontract, and by his assertion that he only left the job site after he was "told he was not going to be paid at all."

¶15     Generally, a person who furnishes services or materials pursuant to a real estate improvement contract may claim a construction lien to secure his contract price.  Section 71-3-523, MCA.  The "contract price" for performing the services and furnishing material covered by the contract may be increased by "(i) the price of change orders or extras; (ii) any amounts attributable to altered specifications; or (iii) a breach of contract, including but not limited to defects in workmanship or materials."  Section 71-3-522(3)(a), MCA.   A person claiming a construction lien "shall give notice of the right to claim a lien to the contracting owner in order to claim a lien."  Section 71-3-531(2), MCA.  However, there are exceptions to this rule.  Under § 71-3-531(1)(a), MCA,  "a person who furnishes services or materials directly to the owner at the owner's request" is

8

not required to give notice of a right to claim a lien. Under § 71-3-531(1)(b), MCA, "a wage earner or laborer who performs personal labor services for a person furnishing any service or material pursuant to a real estate improvement contract" is also not required to give notice of a right to claim a lien. Section 71-3-522(5)(a), MCA, provides: "'[r]eal estate improvement contract' means an agreement to perform services, including labor, or to furnish materials for the purpose of producing a change in the physical condition of real estate . . . ."

¶16 Gwynn claims that the additional work he performed, including road building, concrete demolition, off-site hauling, and septic tank trenching and repair, were discrete projects separate and apart from the subcontract, which contemplated only the dig out, backfill, and machine grade around the foundation. Gwynn argues that the Cumminses personally requested that he undertake these additional projects, as contracting homeowners, and thus an exception to the notice requirement applies. In interpreting the subcontract, which included only the terms "[d]ig out and bacfill [sic] with machine grade ($2000.00)," the District Court concluded that this statement encompassed all of the work performed by Gwynn. However, this conclusion by the District Court required the resolution of material contested facts about the nature of the parties' agreement. Whether the services Gwynn provided were extras or alterations personally ordered by the Cumminses remains a question of fact.

¶17 The Cumminses' second argument is that the District Court correctly concluded that the lien was invalid because Gwynn "quit" the project before it was completed. The

9

general rule in Montana, stated in *Bauer v. Cook*, 182 Mont. 221, 224-25, 596 P.2d 200, 202 (1979), is that a mechanic's lien arises only upon completion or substantial completion of the contracted work. *Durand v. Dowdall*, 232 Mont. 347, 351, 757 P.2d 1302, 1305 (1988). An exception to this general rule applies when the laborer or materialman has been prevented from completing the work by a breach of the owner or a third party. *Durand*, 232 Mont. at 351, 757 P.2d at 1305. "For the subcontractor to fall within the exception it must prove that the contractor's failure to pay was a substantial breach of the contract preventing completion of the work." *Intermountain Electric, Inc. v. Berndt*, 164 Mont. 67, 72, 518 P.2d 1168, 1170 (1974). This Court stated in *Gramm v. Insurance Unlimited*, 141 Mont. 456, 461, 378 P.2d 662, 664 (1963), that "it depends on the particular facts of each case whether or not non-payment of an installment is a total breach enabling the contractor to cease work . . . ."

¶18     The District Court cites to *Durand* in support of its conclusion that Gwynn did not substantially complete this project.  In *Durand*, we held that a contractor's lien was invalid because he did not substantially complete the renovation of a fast food restaurant. We found no substantial completion based on the facts that the interior ceiling was not installed, the interior walls were not completed, the painting, plumbing, and wiring were not completed, none of the necessary electrical fixtures were in the building, the walk-in cooler did not have doors, and the property was not usable for any commercial purpose. *Durand*, 232 Mont at 352, 757 P.2d at 1305.

10

¶19    Here, Gwynn claims that Doug Cummins approached him at the work site on July 26, 2004, and informed him that he would only be paid $180 for the extra work that the Cumminses had allegedly directed Gwynn to perform. When Gwynn told Doug that that was not what they had agreed upon, Doug allegedly retorted, "[t]o hell with you, I ain't paying you nothing," then turned, ran, and drove away.  After that encounter, Gwynn stopped working on the project, leaving approximately six cubic yards of dirt at the site and several yards of old concrete.  The District Court concluded that the concrete and dirt that remained on the site were enough evidence to constitute "incomplete work." However, Gwynn asserts that he completed the four-foot excavation for the foundation, constructed a road, completed the septic tank trenching and repair, demolished a concrete pad, and hauled away some of the concrete pieces, all at the Cumminses' direction and request, before they threatened nonpayment. Whether this validates the lien by constituting substantial completion of the contract, or whether the leftover materials signify incomplete work, are questions for the trier of fact to decide.  In addition, whether the Cumminses' failure to pay constituted a breach that prevented Gwynn from completing the work, thus enacting the exception to the substantial completion rule, likewise constitutes a question of fact.

¶20    Whether the parties intended an oral contract whereby the Cumminses personally ordered Gwynn to complete additional work, and whether the contract was "substantially complete," thus validating the lien, are important factual issues not susceptible to summary judgment.  When an issue of fact arises as to the existence of a contract, and the

11

intentions of the parties play an important part in resolving that question, this Court has held that summary judgment is usually inappropriate. *Reaves*, 189 Mont. at 288, 615 P.2d at 898.

¶21     We conclude that the District Court erred in granting the Cumminses' motion for summary judgment. The order of the District Court is reversed, and the cause is remanded for further proceedings.

/S/ JIM RICE

We concur:

/S/ JAMES C. NELSON
/S/ PATRICIA COTTER
/S/ W. WILLIAM LEAPHART
/S/ BRIAN MORRIS